(1799 and 1806, consolidated—

MARY HARMON, ADMINISTRATRIX OF THE ESTATE OF PATRICK T. HARMON, Deceased, No. 1799 AND MARY HARMON, INDIVIDUALLY, No. 1806, Claimants, vs. STATE OF ILLINOIS, Respondent.

*Opinion filed March 12, 1935.*
*Rehearing denied November 12, 1935.*

ROY J. EGAN, for claimants.

OTTO KERNER, Attorney General; CARL DIETZ, Assistant Attorney General, for respondent.

Mr. Justice Linscott delivered the opinion of the court:

Mary Harmon, as administratrix of the estate of Patrick T. Harmon, deceased, and also on behalf of herself individually, filed her declaration in this court on July 11, 1931 and July 16, 1931 respectively. Both cases grow out of the same state of facts and for that reason are consolidated.

It appears that on the 22nd day of July, 1930, she, together with her husband and Dr. E. Thomas Brand, were on their way from Crystal Lake, Illinois to the City of Chicago, Illinois where Patrick T. Harmon was engaged in business. They were riding in a Packard automobile over a highway known as Northwest Highway, located in Main Township, County of Cook, over a concrete road built by the State of Illinois. The deceased, Patrick T. Harmon was driving.

Claimant alleges that it was the duty of the State of Illinois to keep this highway in such a state of repair that it would be safe to travel thereon but neglected its duty in this regard and negligently suffered the same to be and remain in an unsafe condition and as a direct and proximate result thereof and by means whereof, claimant's decedent who was driving the automobile, necessarily and unavoidably drove into holes in the highway which caused the automobile to turn over and capsize, and Patrick T. Harmon was so severely injured that in consequence thereof he died on the day he received the injuries, and damages in the sum of $10,-000.00 is asked.

Substantially the same averments are made concerning the cause of the accident in the cause that Mary Harmon filed.

Mary Harmon testified that on the day in question her husband, Patrick T. Harmon, was driving the car, which was a new Packard, about thirty days old; that they had left their home that morning in Crystal Lake, Mr. Harmon driving, Mrs. Harmon sitting to his right and Dr. Brand was sitting in the rear of the car; that Mr. Harmon was driving about thirty-three or thirty-five miles an hour, and that she and Dr. Brand were talking casually. She testified that they seemed to strike a rut in the road; that it was a terrible jolt,

and that is about the only thing she could remember as to what happened. This occurred near Desplaines. Mrs. Harmon was rendered unconscious and "came to at quite a distance from the car in sort of a prairie, and the ambulance was there." Both she and Mr. Harmon were placed upon stretchers and taken to the Desplaines Hospital in Desplaines, Illinois. Mr. Harmon died about three hours after that. From the time of the accident until his death, Mr. Harmon was in sort of a semi-conscious condition. Mrs. Harmon testified that Mr. Harmon promoted athletics in connection with the Chicago Stadium Corporation, and Mrs. Harmon testified that he earned from $24,000.00 to $28,000.00 per year. He left an adopted son twenty-eight years old and a daughter, Patricia Harmon, three years of age. Mrs. Harmon did not remember of seeing any other traffic as they drove east on the fatal morning, and had not noticed any warning signs or red flags of any description. She received a very badly lacerated left hip and thigh, the flesh being torn almost to the bone over an area of eight or nine inches square, according to the testimony of Dr. E. Thomas Brand, who was her attending physician. He attended her from the day of the injury which was the 22nd day of July, 1930 up to the 8th or 9th of July, 1931. His bill for professional services is the sum of $1,183.00, no part of which has been paid. Mrs. Harmon also testified she incurred a bill for medicine in the sum of $483.40. She further testified that it was necessary for her to employ a nurse from the day of the injury until sometime in the following May when she tried to get along without a nurse for a week or two, but suffered a very nervous condition and called the nurse back after a few days time and kept her up until July, 1931, at a salary of $49.00 per week. One Thousand Four Hundred Dollars has been paid on her salary, out of a total of $2,451.00. There was also a charge for nurse's board of $343.00. The total amount of her expenditures was $4,459.00. Mrs. Harmon was only in the hospital a day and a night. The hospital bill, though small, was not paid because she considered it too large.

Mrs. Harmon testified that she did not think her husband lost control of the car after striking the so-called bump. It seemed that he just held on to the steering wheel and the car swerved first to the left and then to the right,—the car swerved back and forth and finally left the pavement. Mrs.

Harmon could not say whether the car travelled in this manner a city block or not, and she could not describe this so-called rut that the car struck which caused the accident. Mrs. Harmon did not suffer any fractures or broken bones because of the accident. She was confined to her bed about thirty days as the result of the accident, and then was in a wheel chair for about thirty days, and after sixty days was unable to stand up longer than five or ten minutes at a time; after that she was able to walk about on crutches. It was about the first of October, 1930 before she was able to walk alone.

Edward J. Geiger, Sporting Editor of the Chicago American also testified that he was not an eye witness to the accident, but went to the scene of the accident after he heard of it and took photographs, which were offered in evidence, he being there within two hours after the accident. Claimant's Exhibit 1 is a picture of the concrete road in question. While it shows that the road is not absolutely level, there is nothing in the picture that would indicate any dangerous condition to the road and this is true of Exhibits 2 and 3.

Dr. Brand, who was also present, testified that he was sitting directly behind Harmon; that just before the accident happened, there was a very rough spot in the highway, and it threw the front wheel off to the right, down on the ground on the side of the road off of the concrete; that he, (meaning Harmon) immediately tried to adjust the car and when he did the car shot back over the pavement and over to the opposite side, and the last that Dr. Brand could remember was the car turning over the third time before he became unconscious. He also testified that he could not see the speedometer, but was of the opinion that the car was going about thirty-five miles per hour and there was no other traffic on the road. He testified that at the place where the accident happened, there was a depression in the road where a piece of the concrete was broken out; that it was about two and a half feet long and about two feet wide. The pictures, however, taken within a couple of hours after the accident show that this had been filled in with concrete, and it appears to be ordinary material used to repair concrete highways.

This court must be both judges of the law and the facts in cases of this kind, and nowhere in the record is there such a description of the concrete rut wherein we could say that by the greater weight of the evidence it appears that the

road was in such a state of repair as to render it unsafe for an automobile to be driven over it at thirty-five miles per hour. The evidence contains no measurements that would throw any light upon the depth of the alleged rut, and from the circumstances surrounding the accident, we cannot convince ourselves that at the time of the accident and immediately prior thereto, the driver was free from contributory negligence. It appears from the testimony of Dr. Brand, that at least a part of the car got off on to the shoulder of the road and then shot across the road and turned over at least three times. Insofar as the record is concerned it was broad daylight and the road was dry and there was nothing to obscure vision, and we do not feel that the averment of the declaration, that the deceased was in the exercise of due care and caution, is borne out by the evidence, and giving this testimony the most favorable consideration to support the view of the claimant, we are unable to say that the deceased has been free from contributory negligence, which he must be before she could recover, and the claim on account of the death of Patrick J. Harmon will be dismissed.

We will now consider the claim of Mrs. Harmon who was riding with her husband.

It is the rule that the negligence of the owner and driver of a vehicle cannot be imputed to a person who is riding with him, in case of a collision between the vehicle and another, and we consider this rule as being the same in the case at bar.

Mrs. Harmon testified in substance that she was not paying attention to the road; that she was engaged in casual conservation with Dr. Brand. She did nothing. If she, by using her faculties with ordinary and reasonable care in looking out for danger, could have avoided the injury, but negligently failed to do so, and thereby contributed to her injury, then she cannot recover.

It is a fair inference from the evidence that the alleged hole in the road was 60 or 75 feet from the point where the deceased's car went off the road and into the field. This depression or hole in the pavement was on the right side of the road for traffic headed in the direction the deceased was travelling and it was about 100 feet diagonally from this depression southeast that the Harmon car left the road and went into the field to the point where it stopped. This ap-

pears from the testimony of Edward J. Geiger, and there is no direct testimony that the Harmon car struck this particular depression.

E. F. Aderman of the State Highway Department investigated on the following day. He found skid marks plainly visible, and made a sketch which is a part of the record, showing the location, direction and length of the skid marks, and the location of the rough pavement. According to his report this car turned over and rolled about eighty feet. There is no evidence of the car skidding sideways until it passed the ditch.

We have gone into the facts in this case at length. There are other reasons why there could not be a recovery in this case.

It is a well-established rule of law that the doctrine of respondeat superior does not apply to a State in the exercise of purely governmental functions. The Supreme Court of the United States in the case of *Seymour* vs. *VanSlyck*, 8 Wend. 403; 422; *United States* vs. *Kirkpatrick*, 9 Wheat. 720, 723, laid down this rule:

"The government itself is not responsible for the misfeasances, or wrongs or negligences, or omissions of the duty of the subordinate officers or agents employed in the public service; for it does not undertake to guarantee to any persons the fidelity of any of the officers or agents whom it employs; since that would involve it, in all its operations, in endless embarrassments, and difficulties and losses, which would be subversive to the public interests; and, indeed, laches are never imputable to the government."

This court said in *Hinchscliff* vs. *State*, 2 C. C. R. 159, decided in November, 1931:

"It is * * * a well established rule in this and all other courts that the State is not liable for the negligence, torts, misfeasances or omissions of duty of its officers, agents or servants, for it does not guarantee the fidelity of the agents or officers it employs to carry on its governmental functions."

and this rule has been applied and followed by this court in so many instances where claims have arisen as the result of alleged negligence of officers or servants of the State that a citation of cases is hardly necessary. In each instance such claims were denied for the reason that the State cannot be held liable for the negligent acts of its agents.

Without unduly extending this opinion, it is sufficient to say that enough has been set forth to show that there is no liability in this case, and both claims will, therefore, be denied. Cases dismissed.

### Opinion on Rehearing.

*Per Curiam:*

After a careful consideration of the petition for a rehearing, and the record in the above entitled cases, we find nothing therein that was not carefully considered and passed on by the court in the original opinion in these causes.

The decision heretofore rendered is found to be in accordance with the law and the facts and is hereby affirmed, and the petition for rehearing is denied.